AO-106 (Rev: 06/09)-Application for Search Warrant

*FILED*

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*OCT 2 8 2022*
*Mark C. McCartt, Clerk*
*U.S. DISTRICT COURT*

| | |
|---|---|
| In the Matter of the Search of | ) |
| **13243 South Mingo Road, Bixby, Oklahoma, 74008, Unit #373** | ) Case No. 22-MJ-725-SH |
| | ) |
| | ) **FILED UNDER SEAL** |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1952 | Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises |
| 18 U.S.C. § 1956(a)(1)(A)(i) | Laundering of Monetary Instruments |
| 18 U.S.C. § 1957(a) | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |
| 18 U.S.C. § 2314 | Transportation of Stolen Goods |
| 18 U.S.C. § 1343 | Wire Fraud |
| 21 U.S.C. § 841 | Possession of a Controlled Substance with Intent to Distribute |
| 18 U.S.C. § 922(g) | Possession of a Firearm or Ammunition by a Prohibited Person |

The application is based on these facts:

See Affidavit of TFO Kansas Core, HSI, attached hereto.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Kansas Core, HSI
*Printed name and title*

Sworn to before me via telephone.

Date: 10/28/22

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Susan Huntsman, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE SEARCH
OF 13243 SOUTH MINGO ROAD,
BIXBY, OKLAHOMA, 74008, Unit
#373

Case No. _____

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Task Force Officer Kansas S. Core, being first duly sworn under oath, depose and state the following:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the **Subject Premises**, particularly a single-family residence located at 5812 East 146th Place South, Bixby, Oklahoma, 74008, ("Mansour Residence"), and a commercial business property located at 12808 South Memorial Drive, Bixby, Oklahoma, 74008, Suite #103, ("Mansour Shop"), and a storage unit located at 13243 South Mingo Road, Bixby, Oklahoma, 74008, Unit #373, (**"Mansour Storage"**) within Tulsa County, the State of Oklahoma, and the Northern District of Oklahoma, as further described in Attachments A, for the things described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Task Force Officer with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am currently assigned to the HSI Tulsa Resident Office and have been since February 2022. As such, I am an investigative or law enforcement officer of the United States, as defined in 18 U.S.C. Section § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

3. I am further employed and commissioned in the State of Oklahoma as a Police Officer through the Tulsa Police Department (TPD) since July of 2018. I graduated the Tulsa Police Department Council on Law Enforcement and Training (CLEET) certified police academy in May 2019. I am designated as an investigator within the TPD Riverside Street Crimes Unit (RSCU) and currently assigned as a full-time Task Force Officer to HSI Tulsa. I have graduated and received a Bachelor of Science degree in Criminal Justice from the University of Oklahoma in May 2018. I am assigned to investigate a wide variety of crimes ranging from narcotics distribution, property crimes and thefts, violent crimes, weapons offenses, and organized criminal enterprises. Through my experiences, I have become familiar with, and have participated in a wide range of methods of investigations, including

but not limited to, use of physical surveillance, witness interviews, search warrants, arrest warrants, debriefings and operational use of informants, pen registers, surveillance of undercover transactions, consensually monitored and recorded conversations and phone calls, and reviews of recorded conversations. Additionally, I have participated in investigations that utilized the interception of wire and electronic communications (Title III) and have monitored/minimized numerous calls during these investigations. I attended Title 19 training courses and training courses specializing in the investigation of criminal organizations and money laundering. Through my training and experience, I am familiar with the methods used by criminal organizations to smuggle, safeguard, and to collect and launder illicit proceeds. Through training, education, and experience, I have become familiar with the manner in which criminal enterprises function and have received numerous hours in training from various federal, state, and local law enforcement agencies. Further, I have learned, gained insight, and expanded my training and knowledge relevant to the investigation of catalytic converter thefts to include topics on automotive manufacturing and repair processes, metal recycling and industrial refining, supply chain logistics and the precious metals market through various methods to include interviews and discussions with automotive mechanics, automotive dealerships, local scrapyards and metal recyclers and other industry professionals. Additionally, I have attended or took part in both formal and informal training on the topic of catalytic converter theft with subject matter experts to include those of the National Insurance Crime Bureau (NICB), Oklahoma Used Motor

Vehicle & Parts Commission (UMVPC), Oklahoma Department of Agriculture,

Food and Forestry (ODAFF) and others.

4. I am familiar with the facts and circumstances of this investigation. The facts

set forth in this affidavit are based on my personal observations, knowledge obtained

from other law enforcement officers, my review of documents related to this

investigation, conversations with others who have personal knowledge of the events

and circumstances described herein. Because this affidavit is submitted for the

limited purpose of establishing probable cause in support of the application for a

search warrant, it does not set forth each and every fact I or others have learned

during the course of this investigation.

5. Based on my training, experience, and the facts set forth in this affidavit,

there is probable cause to believe that evidence of violations of Title 18, United

States Code, Section 1952 (Interstate and Foreign Travel or Transportation in Aid of

Racketeering Enterprises); Title 18, United States Code, Section 1956(a)(1)(A)(i)

(Laundering of Monetary Instruments); Title 18, United States Code, Section

1957(a) (Engaging in Monetary Transactions in Property Derived from Specified

Unlawful Activity); Title 18, United States Code, Section 2314 (Transportation of

Stolen Goods);  Title 18, United States Code, Section 1343 (Wire Fraud); Title 21,

United States Code, Section 841 (Possession of a Controlled Substance with Intent to

Distribute), Title 18, United States Code, Section 922(g) (Possession of a Firearm or

Ammunition by a Prohibited Person), (the **"Target Offenses"**), will be located at the

**Subject Premises**, particularly a single-family residence located at 5812 East 146th

4

Place South, Bixby, Oklahoma, 74008, ("Mansour Residence"), and a commercial

business property located at 12808 South Memorial Drive, Bixby, Oklahoma, 74008,

Suite #103, ("Mansour Shop"), and a storage unit located at 13243 South Mingo

Road, Bixby, Oklahoma, 74008, Unit #373, ("**Mansour Storage**"), within Tulsa

County, the State of Oklahoma, and the Northern District of Oklahoma, as further

described in Attachment A.

## Jurisdiction

6. "[A] warrant may be issued to search for and seize any property that

constitutes evidence of a criminal offense in violation of the laws of the United

States." 18 U.S.C. § 3103a.

7. The requested search is related to the following violations of federal law:

    a. Title 18, United States Code, Section 1952 (Interstate and Foreign
Travel or Transportation in Aid of Racketeering Enterprises);
    b. Title 18, United States Code, Section 1956(a)(1)(A)(i) (Laundering of
Monetary Instruments);
    c. Title 18, United States Code, Section 1957(a) (Engaging in Monetary
Transactions in Property Derived from Specified Unlawful Activity);
    d. Title 18, United States Code, Section 2314 (Transportation of Stolen
Goods);
    e. Title 18, United States Code, Section 1343 (Wire Fraud);
    f. Title 21, United States Code, Section 841 (Possession of a Controlled
Substance with Intent to Distribute), and
    g. Title 18, United States Code, Section 922(g) (Possession of a Firearm or
Ammunition by a Prohibited Person.

8. Venue is proper because the person or property described in this affidavit is

located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

## Basis of Investigation

9. During the course of my training and experience, I have learned how individuals involved in catalytic converter theft schemes, organized criminal enterprises and others who have committed similar **Target Offenses** operate. I am submitting this affidavit based upon my personal experiences and familiarity with the investigation of the subjects, **Tyler Curtis, Reiss Curtis, Kimberly Biby, Thomas Biby, Ryan LaRue, Brian Thomas, Shane Minnick, Parker Weavel, Michael Rhoden, Benjamin Mansour, Rami Mansour, Brennan Doss, Adam Sharkey**, and others, (henceforth referred to as **"Subjects"**). As a result of my personal participation in this investigation and reports made to me by other law enforcement officers and information obtained from confidential sources, I am familiar with all aspects of this investigation. On the basis of this familiarity, and the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this Affidavit show that there is probable cause to believe that the **Subjects** have committed, are committing and will continue to commit violations of the **Target Offenses**.

10. Based on my background, training, and experience, as previously detailed in this affidavit, I know:

    a.   Those involved in the organized criminal enterprises centered around the purchasing of stolen catalytic converters often place assets in names other than their own to avoid detection of these assets by law enforcement. In

addition, criminals often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.  Even though these assets are in the names of other people, the criminal offenders continue to use these assets and exercise dominion and control over them;

c.  Due to the nature of their customers, buyers of large numbers of stolen catalytic converters must maintain a large amount of U.S. currency in order to finance their ongoing criminal activities;

d.  Buyers of stolen catalytic converters maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase and transfer of stolen catalytic converters;

e.  Buyers of stolen catalytic converters often keep records that are usually recorded by quantity, parts codes, and/or and monetary value, to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the buyer; the aforementioned records, books, notes, ledgers, etc., are maintained where buyers have ready access to them, i.e., on their persons, in their vehicles, in or about their residences and places of business;

7

f.  It is common for buyers of stolen catalytic converters to hide proceeds of derived from the sales of stolen catalytic converters, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of criminal activities, records and evidence of transactions relating to transferring, hiding or spending large sums of money made from engaging in criminal activities in secure locations on their persons, within their vehicles, within or around their residences and businesses for ready access or to conceal them from law enforcement authorities;

g.  When buyers of stolen catalytic converters collect proceeds from the selling of the same, they attempt to legitimize these profits. To accomplish these goals, these criminal offenders utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations and business frauds;

h.  Buyers of stolen catalytic converters commonly maintain names, addresses and telephone numbers in books or papers for their associates in the criminal organization. These books or papers include such items as address books, telephone messages, etc. Shorthand and/or code names are sometimes used for buyers, co-conspirators, customers, and other details;

i.  Buyers of stolen catalytic converters often hide and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences and the residences of co-conspirators, financial

records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that courts have recognized that unexplained wealth is derived from crimes motivated by greed, in particular, transportation of stolen goods;

j.  The books, records, receipts, notes, ledgers, and other items mentioned above are commonly maintained where the criminal offenders have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k.  Buyers of stolen catalytic converters take or cause to be taken photographs of themselves, their associates, their property and their products. These criminal offenders usually maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l.  Buyers and transporters of stolen catalytic converters often maintain related materials used in the packaging, shipping and transporting, or deconstruction of catalytic converters. This related material includes, but is not limited to, cutting tools, "de-canning" equipment, discarded oxygen sensors, and other devices used for packaging, dismantling, concealing or transporting stolen goods;

m. Buyers of stolen goods, such as catalytic converters, often keep handguns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard the often large

9

sums of wealth which they possess to conduct day to day business operations;

n. Buyers of stolen catalytic converters sometimes operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

o. Those involved in the buying and transporting of stolen catalytic converters commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities.

p. Persons engaged in the criminal activities to include the purchasing and reselling of stolen catalytic converters often carry and possess firearms during and in relation to and in furtherance of their crimes. They also photograph themselves and others with stolen goods, firearms, and money proceeds. Such photographs are often kept in digital form on cell phones;

q. Those involved in purchasing of stolen catalytic converters rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of stolen goods, and they

10

frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications;

r.  Buyers of stolen catalytic converters commonly keep their inventory of stolen goods in the form of catalytic converters and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

s.  Individuals involved in illegal activities such as purchasing and transporting of stolen catalytic converters often generate large amounts of wealth from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of financial transactions to disguise and conceal profits. Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity. Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes, or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property, or financial institutions;Those involved in illegal activities such as the purchasing and reselling of stolen catalytic converters often are involved in other unrelated, but overlapping crimes, such as the use, distribution, and selling of illegal drugs and firearms, sometimes in which

stolen catalytic converters are exchanged or bartered for the referenced

drugs or firearms, or vice versa.

**Electronic Devices**

11. Based upon my training and experience, and information related to me by

agents and others involved in the forensic examination of computers, I know that

computer data can be stored on a variety of systems and storage devices including,

but not limited to, hard disk drives, floppy disks, thumb drives, compact disks,

magnetic tapes, memory chips, cellular telephones, iPads and other portable

electronic devices. I also know that during the search of the premises it is not always

possible to search computer equipment and storage devices for data for a number of

reasons, including the following:

    a. Searching computer systems is a highly technical process which requires

       specific expertise and specialized equipment. There are so many types of

       computer hardware and software in use today that it is impossible to bring

       to the search site all of the necessary technical manuals and specialized

       equipment necessary to conduct a thorough search. In addition, it may

       also be necessary to consult with computer personnel who have specific

       expertise in the type of computer, software application or operating system

       that is being searched.

    b. Searching computer systems requires the use of precise, scientific

       procedures which are designed to maintain the integrity of the evidence

       and to recover "hidden," erased, compressed, encrypted or password-

12

protected data.  Computer hardware and storage devices may contain

"booby traps" that destroy or alter data if certain procedures are not

scrupulously followed.  Since computer data is particularly vulnerable to

inadvertent or intentional modification or destruction, a controlled

environment, such as a law enforcement laboratory, is essential to

conducting a complete and accurate analysis of the equipment and storage

devices from which the data will be extracted.

c.  The aforementioned facts most commonly necessitate the seizure of

computers, cellular telephones, iPads and other portable electronic devices

and all related computer equipment in order to conduct a search by

Forensic Examiners in the well-equipped and controlled environment of a

laboratory setting. If any electronic storage device is seized during the

search of the premises described in Attachment A, a separate warrant will

be sought before searching those storage devices for data.

### Probable Cause

12. On or about November 2020, the Tulsa Police Department (TPD) began

an investigation in to organized catalytic converter theft (CCT) in Northeast

Oklahoma involving Transnational Criminal Organizations (TCOs). Since

September 2021, HSI Tulsa has conducted a criminal investigation of these illegal

enterprises associated to the DG Auto organization, to include Curtis Cores, Green

Country Auto & Parts, Capitol Cores, and numerous others. These CCT related

crimes are a nationwide dilemma and part of numerous ongoing criminal enterprises

that are occurring across the United States. The stolen catalytic converters are shipped internationally to be refined down to the precious metals contained within. The criminal organizations have been identified to involve hundreds of millions of dollars in financial transactions over the past several years.

13. These criminal elements are estimated to have resulted in hundreds of thousands of dollars in damage to vehicles within the Tulsa, Oklahoma, and surrounding area alone. The theft of a catalytic converter results in damage to the vehicle which render the vehicle inoperable to the victim until replaced. Not only are the vehicles mechanically unable to be driven but are further restricted from use under Environmental Protection Agency (EPA) regulations until repaired. The costs of repair are dependent upon the vehicle's make and model but are often more than one thousand dollars up to multiple thousands of dollars, not excluding labor. This investigation targets the organization, which includes both "cutters" and "buyers."

### Case Specific Definitions

14. "Catalytic Converters" are a component of an automotive vehicle's exhaust system that reduce the toxic gas and pollutants from the vehicle's internal combustion engine into safe emissions by catalyzing a redox reaction process. Catalytic converters are required components on all automobiles in the United States as regulated by the EPA. These catalytic converters are targeted by criminals due to the precious metals contained within the converters internal Catalyst or "Core" which include Palladium, Platinum, and Rhodium. These metals are commonly referred to as Platinum Group Metals (PGMs) and are known to be extremely

valuable. A worldwide supply shortage has continued to bring an increase in both the demand and value for these PGMs with prices driven to all-time highs. Investigators have identified several indicia of stolen catalytic converters, including rough-cut or jagged edges, cuts made at uneven angles, and other signs of haphazard removal, as well as the appearance of having been removed from new vehicles, despite catalytic converters having a long-term life expectancy and not requiring frequent replacement. Through the investigation, agents have learned that a repair facility would typically unbolt a catalytic converter at a flange for easy installation of the replacement catalytic converter. If a mechanic cuts a catalytic converter with a torch or reciprocating saw, investigators learned the cut would be smooth and at a 90-degree angle, for easy replacement. In addition to the cutting methods, stolen catalytic converters typically have Oxygen Sensors[1] ($O^2$ sensors) attached with the electronic wiring carelessly cut, inconsistent with professional mechanic service in which the $O^2$ sensor would be detached carefully to be retained or a new one replaced using the same wiring.

15. A "Cutter" is a person who steals catalytic converters. The investigations have shown that often these catalytic converters are stolen by individuals using handheld power tools, such as reciprocating saws ("sawzalls")[2], pneumatic or

---

[1] An Oxygen Sensor, or $O^2$ Sensor is a small electronic device with attached wiring installed on to a catalytic converter to measure the unburned oxygen in the exhaust to provide electronic data for proper engine performance.
[2] A reciprocating saw or "sawzall," is a handheld electric or battery powered saw commonly used for demolition and remodeling. It can be used to cut through various materials such as wood, metal, or PVC.

hydraulic pipe-cutters, or oxy-acetylene gas cutting torches. Those involved in CCTs are often career criminals with past offenses related to theft and illicit drug use. Through various investigations, cutters have been identified to exchange stolen catalytic converters for cash, and sometimes controlled substances. Many criminals have refocused their illegal efforts towards CCTs due to current lucrative return in illegal profit for their activity. Further, the lack of unique serial numbers, VIN information or other distinctive identification features on catalytic converters in addition to the lack of legislative and statutory regulations create evidentiary difficulties for law enforcement. Since November of 2020, TPD has arrested several suspects involved in CCTs.

16. A "Buyer" is a purchaser of stolen catalytic converters. Generally, buyers are illegal operations without proper licensing or business credentials in the State of Oklahoma. Investigators have found that there are various levels in a hierarchy, from "Intermediate Buyers," to large-scale "Core Buyers" that operate entire business operations solely focused upon the purchasing and selling of catalytic converters. The investigation has shown that many intermediate buyers operate the business of illegal purchasing of stolen catalytic converters through outwardly legitimate businesses. These include automotive repair shops, junk car buyers, used car dealerships, insurance agencies or other similar industry types. These business fronts are used to obscure the criminal nature of the activities related to the handling of stolen catalytic converters. Title 2, Oklahoma Statutes, Section 2-11-91 (The Oklahoma Scrap Metal Dealers License Act) identifies a "scrap metal dealer" as any

16

person, firm or corporation that buys, sells, salvages, processes, or otherwise handles scrap metal materials. The Act further identifies a catalytic converter as a specially regulated item. All persons must be licensed within the State of Oklahoma to be a scrap metal dealer. As the investigation has progressed and more arrests have been made, many illegal buyers have become increasingly aware of the legal requirements required to purchase catalytic converters and have attempted to mimic many of the required regulations. Some have even sought applications for Scrap Metal Dealer licenses yet continue to knowingly purchase stolen catalytic converters.

17. "Recyclers" or "Refiners" are the final destination of stolen catalytic converters. Intermediate buyers or large-scale core buyers deliver shipments of catalytic converters to these refinery and recycler locations for the extraction of the precious metals. Many of these operations have been found to be internationally based in foreign countries. Buyers have been found to deliver stolen catalytic converters to coastal ports and then shipped internationally. The corporations will then provide wire payment to the buyer after the completion of the refining process and the final weight of the PGM material recovered is determined.

## Initiation of Investigation

18. Since October of 2020 to the present date, the TPD Riverside Division has tracked over 700 reported incidents. This excludes reports which were improperly assigned to other investigative units under different crime types, localities, or other local law enforcement agencies to include campus police departments such as the University of Oklahoma – Tulsa Campus, Oklahoma State University – Tulsa

17

Campus, Tulsa Community College, or private campus security reports to include the University of Tulsa, or Tulsa International Airport police. Investigators know each of these local locations are heavily targeted by thieves with dozens of reported incidents. Further, many reported incident reports often document the thefts of catalytic converters of numerous vehicles, up to dozens at a time, from one location and on the same date and time. This includes commercial businesses, auto dealerships, or rental lots which are commonly targeted.

### Steven Low

19. Through the arrests of several cutters related to CCTs in Tulsa, Oklahoma, the Tulsa Police Department identified intermediate buyer Steven Low Sr. Low owns and operates a local insurance business, EZ Insurance Agency, located in Tulsa, Oklahoma. Through interviews, collection of physical and electronic evidence to include receipts, handwritten notes, documents, cellphones communications, electronic data, video footage, and other investigative methods, Low was found to meet various cutters in Tulsa, Oklahoma, to purchase the stolen catalytic converters in exchange for cash payments.

20. On April 29, 2021, a confidential source (CS-1) conducted a controlled delivery of two implied stolen catalytic converters to Low while under the surveillance of law enforcement.

21. A Tulsa County District Court search warrant was obtained for Low's vehicle, a white GMC Sierra 1500. On April 30, 2021, the GPS tracker showed Low

to visit a business at 24890 East Highway 51, Broken Arrow, Oklahoma, 74014, later identified as the Curtis Cores shop.

22.     On May 7, 2021, TPD served two Tulsa County District Court search warrants, signed by Judge April L. Seibert, at the Low residence located at 5823 South 83rd East Place, Tulsa, Oklahoma, and the Low insurance business located at 1207 South Memorial Drive, Tulsa, Oklahoma. Investigators recovered $9,700 in U.S. Currency, 15 grams of marijuana, 7 grams of methamphetamine, 14 firearms and 103 catalytic converters. The catalytic converters located had rough-cut edges and saw marks, haphazard signs of removal, and other common indica of stolen catalytic converters.

23.     Low's cellphone was seized and downloaded which revealed text messages and Facebook messages that showed Low to be selling stolen catalytic converters to a larger core buyer Tyler Curtis, as well as other intermediate buyers Benjamin Mansour, and Enrique Torres. On May 14, 2021, Tulsa County District Court Special Judge Tonya N. Wilson signed search warrants for the Facebook profile utilized by both Low and T. Curtis, uncovering further portions of the conspiracy and related organizations.

24.     Two cutters identified to sell to Low by investigators were Randall Hobson and Lauren Schell, involved in dozens of thefts in Tulsa, Oklahoma, and arrested by law enforcement on several occasions. On March 21, 2021, a screenshot of Hobson and Schell's arrest in a news media story was sent by T. Curtis to Low in a text message. Low replied, "yep, hopefully no names." T. Curtis responded, "That's

what I was thinking with the notepad they found," followed by, "you never told them my name right?" Low stated, "nope," to which T. Curtis replied, "Good. I hope they never wrote your name down either." Low sent T. Curtis, "I know," to which T. Curtis responded, "Just be careful."

25. Low additionally sold stolen catalytic converters to fellow intermediate buyers Benjamin Mansour, operating under Green Country Auto & Parts, and/or Premier Hybrid and Battery, LLC, in Bixby, Oklahoma, and Enrique Torres, employee of Azteka Motors in Tulsa, Oklahoma. Investigators later discovered B. Mansour and E. Torres to be co-conspirators involved in the delivery of stolen catalytic converters to T. Curtis and the criminal operation of Curtis Cores.

26. The text messages between Low and B. Mansour confirmed that B. Mansour owns and operates a business identified as Green Country Auto & Parts based out of Bixby, Oklahoma, located at the Mansour Shop. Through the conversations, investigators were able to decipher that B. Mansour is affiliated with the same criminal enterprise DG Auto organization as T. Curtis. B. Mansour sent Low numerous catalytic converter pricelists with DG Auto watermark and company headers.

27. Through various records and law enforcement databases, investigators confirmed B. Mansour's identity by the phone numbers used. B. Mansour communicated with Low through phone numbers (918) 551-9456 and (918) 706-3000. Subscriber records have been obtained for the phone numbers, which show both to be associated to B. Mansour. The returned records list the subscriber's name

as Kelsey Mansour, wife of B. Mansour. The subscriber address was given as the Mansour Residence. The phone number of (918)551-9456 listed the "device name" as "GC Automotive and Parts LLC." In addition, the phone number (918) 706-3000 was saved within Low Sr's cellphone as "ben converters 2." B. Mansour has emailed catalytic converter pricelists to Low utilizing the email ben@gcautoparts.com.

28. Through the communications on Low's phone, B. Mansour identified criminal business partners Matthew Weatherford and Gavin Shadrick, who is B. Mansour's brother-in-law. Both Weatherford and Shadrick would purchase stolen catalytic converters for B. Mansour, often from Low. Low's first communication with B. Mansour by text message was on October 5, 2020, which continued through March 2021, solely centered upon the buying, and selling of catalytic converters.

29. Low would send photos of catalytic converters, or the catalytic converter's parts codes to B. Mansou, who would reply to Low with a price quote for the catalytic converter. Low and B. Mansour then planned meetings to conduct the exchange of catalytic converters. Several times B. Mansour sent Weatherford or Shadrick to meet Low. On October 29th, 2020, B. Mansour sent the Mansour Residence address to Low Sr. and asked for an "ETA," referring to the estimated time to arrival. B. Mansour paid Low through various methods including cash, CashApp, and money wires.

**Tyler Curtis Arrest**

30. On May 2, 2021, TPD officers were assigned to a call for service to investigate a suspicious vehicle described as a white truck with a large number of

21

catalytic converters in the truck bed. The officers located the vehicle and conducted a probable cause traffic stop of the vehicle. The officers observed hundreds of catalytic converters visible in the bed of the truck. The catalytic converters had rough-cut, jagged edges, and cuts made at uneven angles, often consistent with the appearance of stolen catalytic converters taken with reciprocating saws by cutters. The driver of the vehicle was identified as Tyler Curtis and the passenger to be Christopher Rankins. T. Curtis admitted to officers that he possessed a handgun in the center console. The officers requested T. Curtis and Rankins exit the vehicle to secure the firearm and observed medical marijuana containers in plain view. T. Curtis and Rankins were placed under arrest.

31. During the search of the vehicle, officers located $9,922.00 in cash, 3 grams of cocaine, 8 grams of heroin, 7 pills identified as Buprenorphine-Hydrochloride, 7 pills identified as Dextro-Amphetamine, 2 pills identified as Oxycodone, other prescription medications, 1 loaded handgun, 14 discarded $10,000 bank bands, 2 personal cellphones and one Apple iPad, in addition to 128 suspected stolen catalytic converters in the truck bed.

32. The heroin discovered by officers inside of the vehicle was individually packaged in several different containers consistent with the illicit distribution of narcotics. A search of Rankins uncovered an additional concealed bindle of heroin consistent with the heroin bindles discovered in T. Curtis's vehicle.

33. After being advised of his rights, T. Curtis agreed to speak with investigators. T. Curtis identified his business as Curtis Cores, LLC., and stated that

22

he has been involved in the business since approximately 2019. T. Curtis identified his business location to be 24890 East Highway 51, Broken Arrow, Oklahoma, the Curtis Cores shop, which investigators recognized as the address Low had been observed at days prior. T. Curtis confirmed that he rented the building from the neighboring car dealership JT Wholesale Auto. This was later confirmed by rental agreements, utilities, and other documents from the physical and electronic evidence seized.

34. T. Curtis stated that he buys the catalytic converters from muffler shops and car lots, but not from individuals. He further identified the catalytic converters in his truck as being purchased from Azteka Motors in Tulsa, Oklahoma. Receipts recovered from the search of T. Curtis's vehicle documented purchases from Low, E. Torres, and others. T. Curtis stated that he ships the catalytic converters to Dowa Metals & Mining, a company in Burlington, New Jersey, where the catalytic converters are sent to Japan for refining and extraction of precious metals. T. Curtis confirmed that he did not have a valid Oklahoma Scrap Metal Dealer's License but stated that his father Joseph Curtis had applied for one.

35. T. Curtis and Rankins were booked into Tulsa County jail for state offenses in Tulsa County District Court for Possession of Controlled Dangerous Substance with Intent to Distribute and Possession of a Firearm in Commission of a Felony[3]. Upon the completion of the interview, arrest, and booking of T. Curtis and

---

[3] On April 11, 2022, Tyler Curtis received a deferred sentence in Tulsa County District Court with a guilty plea to Unlawful Possession of Controlled Dangerous Substance with Intent to

Rankins, investigators drove to the Curtis Cores shop. Investigators observed stacks of numerous cut catalytic converters and diesel particulate filters (DPFs) stored outside of the business in plain view.

36. Upon his booking into Tulsa County Jail, investigators observed several recorded phone conversations placed by T. Curtis while in custody. Callers from the Tulsa County Jail are advised, by a pre-recorded warning, that all phone calls made are recorded and subject to monitoring. Curtis made several phone calls to his father Joseph Curtis, mother Monica Curtis, and at the time fiancé, now wife Reiss Curtis. During the recorded calls, T. Curtis stated that his iPad had been seized and indicated that the contents would be incriminating for him. T. Curtis further asked his father and mother to go to the Curtis Cores shop and remove any incriminating evidence. Joseph Curtis confirmed that he would.

### Curtis Cores & DG Auto

37. A search warrant, authorized on May 14, 2021, by Tulsa County District Judge Tonya Wilson, for T. Curtis's iPhone and Apple iPad, revealed that T. Curtis and was a large-scale Core Buyer doing business as Curtis Cores, but affiliated with a larger criminal organization referred to as DG Auto. The DG Auto organization is led by a subject identified as Lovin Khanna of New Jersey. T. Curtis has employed several full-time employees as criminal associates which includes Brian Thomas,

---

Distribute, Unlawful Carrying a Weapon, Acquire Proceeds from Drug Activity, and Unlawful Possession of Controlled Dangerous Substance. Tyler Curtis is on probation for the above-stated offenses until 2025.

Ryan LaRue, Shane Minnick, Parker Weavel, Michael Rhoden, William Gibson, and more loosely part-time employees to include J. Curtis, K. Biby and others. T. Curtis purchases stolen catalytic converters from local intermediate buyers such as Low, E. Torres, B. Mansour, and various other regional buyers across Oklahoma, Texas, Arkansas, Louisiana, New Mexico, Missouri, Kansas, Minnesota, California, and other states since approximately December 2020.

38. Since the date of his arrest, T. Curtis has filed for and been issued an Oklahoma Scrap Metal Dealer's License, allowing him to purchase scrap metal, including catalytic converters. Investigators have confirmed, through surveillance and observed communications, that T. Curtis purchases stolen catalytic converters. Investigators believe his recent application for a scrap metal dealer license was an attempt to obscure his activities and the overall criminal enterprise.

39. T. Curtis has been found to both receive and send pallets which contain bulk quantities of catalytic converters through Tulsa based ABF Freight (ArcBest) and other shipping companies such as Old Dominion Freight. Some shipments of large pallets which contain hundreds of catalytic converters have been observed to be delivered to the Curtis Cores shop by privately owned vehicles, rented U-Haul trucks and other means of transportation.

40. T. Curtis and other Curtis Cores employees evaluate, package, and transport the catalytic converters to Adam Sharkey of Capital Cores Corp in Lindenhurst, New York, Lovin Khanna of DG Auto in Wrightstown, New Jersey, or directly to Dowa Metals & Mining America, Inc. in Burlington, New Jersey. Each

of the named businesses; Curtis Cores, DG Auto, Capitol Cores and Dowa are involved in an interdependent criminal business relationship. The catalytic converters shipped primarily to New York and New Jersey are received by either Sharkey or Khanna for de-canning[4], and various DG Auto related employees, then prepared for delivery to Dowa.

41. Dowa Mining & America is a subsidiary company of Nippon PGM. Dowa will ship the material to the parent company Nippon PGM where it will be received by partner company Tanaka in Akita, Japan to be refined down through a process called toll refining. The precious metals are refined, extracted, and weighed, with payment issued to DG Auto.

42. The investigation of DG Auto has shown that the business provides various operational, financial, and other incentives to members such as T. Curtis. DG Auto provides funding to intermediate buyers such as advanced payments to provide accessible cash flow for further catalytic converter purchases. The business in which T. Curtis and other DG Auto members operate has been determined to be primarily conducted through cash transactions, due to the large purchases conducted, to obscure financial and tax reporting, and avoid a paper trail leading to transactions conducted with criminal cutters. Through the interception of communications, historical communications, physical surveillance, and location

---

[4] De-Canning is a term used for the process of removing the outer metal casing of a catalytic converter to extract the powdery catalyst contained within. This catalyst or powder contains the raw precious metals sought after for later refining.

data, investigators have confirmed that T. Curtis and other Curtis Cores employees have received smuggled bulk cash from Khanna and Sharkey, most often more than $1,000,000, on numerous occasions.

43. Through historical Facebook communications, subpoenaed records of U-Haul rentals, and physical surveillance, investigators confirmed that T. Curtis and employees drove a delivery of catalytic converters from Oklahoma to New Jersey, returning with approximately $2,500,000 U.S. currency.

44. Over the course of the investigation, T. Curtis and Curtis Cores have received approximately $13,144,093.00 and an additional $513,533.39 has been received from Capitol Cores for the shipment of catalytic converters, most of which were stolen. T. Curtis has withdrawn most of all wired payments in the form of cash. These wire transfer numbers do not include the smuggled proceeds which are most often concealed and personally transported by co-conspirators such as T. Curtis or other Curtis Cores employees.

45. T. Curtis is a member of numerous Facebook group chats with other members of the DG Auto organization. Tulsa County District Court search warrants were obtained for T. Curtis's personal Facebook account "Tyler Curtis" on May 14, 2021. T. Curtis deleted this profile shortly after his arrest. A new Facebook account was created and located by investigators under the publicly viewable vanity name of "Curtis Cores" (Facebook ID: 100074273123634). Tulsa County District Court search warrants were obtained for the account on January 14, 2022, signed by Judge April L. Seibert and a second on March 25, 2022, signed by Judge David A. Guten.

27

46.  Through the obtained Facebook returns, investigators have viewed group messages with T. Curtis and co-conspirators A. Sharkey, L. Khanna, and numerous other DG Auto members in which they discuss details of their knowledge of the stolen source of the purchased catalytic converters and other criminal conspiracy.

47. On April 6, 2022, the Honorable Claire V. Eagan of the Northern District of Oklahoma authorized the interception of electronic communication of T. Curtis's Facebook account, with an authorized extension on May 6, 2022. The interception of electronic communications for the Facebook account concluded on June 6, 2022.

48. On April 27, 2022, the Honorable Claire V. Eagan in the Northern District of Oklahoma authorized the interception of wire and electronic communications of T. Curtis's cellphone number (918) 734-9269. This interception of wire and electronic communication was authorized for extension on May 27, 2022, and concluded on June 26, 2022.

49. On July 21, 2022, the Honorable Claire V. Eagan in the Northern District of Oklahoma again authorized the interception of wire and electronic communications for T. Curtis's cellphone number (918) 734-9269 which was concluded on August 20, 2022.

Mansour Residence

50. From the various data obtained from T. Curtis's devices and accounts, including communications between T. Curtis and B. Mansour, T. Curtis first contacted B. Mansour on January 2, 2021, by text message. T. Curtis saved B. Mansour's phone number (918) 706-3000 in his cellphone as "BEN Adams Guy," in

reference to their mutual contact within the DG Auto organization, Adam Sharkey. In the first messages sent, T. Curtis stated that he received B. Mansour's phone number from Low.

51. In the communications, B. Mansour identified himself to be in Bixby, Oklahoma, to purchase catalytic converters, and said that he ships up to 2 pallets of catalytic converters a week, further elaborated to mean approximately 100 to 150 catalytic converters every 10 days. B. Mansour agreed to meet T. Curtis to sell him $10,000 in catalytic converters as a test of their new partnership. B. Mansour met T. Curtis at the T. Curtis residence on January 3, 2021, at 2:07 am.

52. On the same date as the first transaction between B. Mansour and T. Curtis, T. Curtis text messaged L. Khanna to discuss B. Mansour. T. Curtis asked, "So how am I supposed to buy around Tulsa when someones [sic] already buying at yalls [sic] prices." When L. Khanna asked T. Curtis who he meant, he sent B. Mansour's name, stated he is listed on the DG Auto app, and selling catalytic converters to Sharkey in New York. Later, in a separate discussion with L. Khanna, T. Curtis, and A. Sharkey, Khanna instructed A. Sharkey to cease business with B. Mansour. In the communication, A. Sharkey clarified that L. Khanna meant, "Ben Mansour," which L. Khanna and T. Curtis confirmed. A. Sharkey stated that B. Mansour ships a pallet of catalytic converters to him approximately once a month and Sharkey pays him by wire transfer. L. Khanna concluded the discussion by stating that B. Mansour will have to sell through T. Curtis locally. Since this

29

incident, B. Mansour has consistently conducted business with T. Curtis and Curtis Cores, delivering catalytic converters up to the present time.

53. On January 23, 2021, T. Curtis asked B. Mansour what he needed to do to conduct legal business of buying and selling catalytic converters. B. Mansour informed T. Curtis that he held an "LLC," and owned a "mechanic shop," which was an alternative to spending "100k" to be a salvage dealer. B. Mansour told T. Curtis that he can legally sell his catalytic converters to him instead, to skip all "the BS" and make more money. B. Mansour encouraged T. Curtis to figure out his business before the "alphabet boss" investigated him, referring to the federal government. B. Mansour recommended that T. Curtis and he meet in person to discuss everything further. At the time of this discussion, to the present, B. Mansour did not and does not possess a valid Oklahoma Scrap Metal Dealer's License, making any purchases of catalytic converters illegal by state law.

54. The communications show that B. Mansour is knowingly using the Mansour Shop as a business front to conduct the illegal business, in which the automotive mechanic shop can provide the appearance of a legitimate supply of catalytic converters.

55. On January 14, 2022, a search warrant was obtained for T. Curtis's Facebook profile of Curtis Cores. Communications were observed between B. Mansour and T. Curtis, in which B. Mansour was observed stating that he was delivering catalytic converters and firearms to T. Curtis at the Curtis Cores shop. In the communications, B. Mansour stated that he separated business partnerships with

Weatherford, while waiting on the establishment of a new LLC, and that he discussed delivering to T. Curtis with A. Sharkey.

56. Later that day, B. Mansour stated that he was enroute to deliver catalytic converters and was further bringing T. Curtis 4 different handguns to include an AK-47 pistol, Kimber, and a "Big Magnum." On February 2, 2022, B. Mansour delivered 6 catalytic converters and ammunition to Curtis Cores shop.

57. B. Mansour was observed through physical surveillance to have delivered further catalytic converters to the Curtis Cores shop on February 8, 2022, and on February 17, 2022.

58. On February 19, 2022, in observed Facebook messages, T. Curtis told B. Mansour to not bring "weed," because nobody wanted it. B. Mansour asked if T. Curtis was sure because it was vacuum sealed and ready to go.

59. On February 20, 2022, in observed Facebook messages, B. Mansour informed T. Curtis that he had four semi-automatic handguns and ammunition that his cousin wanted to sell. B. Mansour stated that these handguns were in addition to the other "weapons" that he was already bringing. T. Curtis informed B. Mansour to meet his guys when they are not at the Curtis Cores shop. B. Mansour apologized for putting T. Curtis in an awkward situation and that he would be more careful in the future.

60. Several deliveries brought to the Curtis Cores shop for B. Mansour were delivered by brother Rami Mansour, as observed by physical surveillance. R. Mansour is identified in various communications by B. Mansour as a business

31

partner and brother. R. Mansour has also purchased catalytic converters from identified cutters at B. Mansour's instruction. Through physical surveillance and pole camera footage, R. Mansour and B. Mansour have been recorded in numerous deliveries to Curtis Cores shop, on average approximately once per week on between approximately April 2022 through June 2022.

61. On June 30, 2022, a GPS tracking device was authorized in Tulsa County District Court by Judge David A. Guten for B. Mansour's personal vehicle, a 2019 Chevrolet Tahoe bearing Oklahoma license plate MJR999. The GPS tracking device revealed that B. Mansour visited the Curtis Cores shop over a dozen dates and times between July 2022 through August 2022.

62. On January 13, 2022, Tulsa County District Court Judge Deborrah L. Leitch signed a search warrant for the Facebook profile "Ben Monsoor," used by B. Mansour. The same profile was used by B. Mansour in Facebook messages to and from Low and T. Curtis.

63. B. Mansour was found to have a lengthy history with A. Sharkey of Capitol Cores and the larger DG Auto organization through over 8,836 Facebook messages beginning in May 2020. The communications involved the shipping of catalytic converters from Oklahoma to New York, and included various invoices, wire transfers, photographs, and bank account numbers.

64. B. Mansour provided several accounts for wire transfers provided by Sharkey. A financial investigation has shown that B. Mansour received

approximately $1,204,209 in wire transfers from A. Sharkey doing business as Capitol Cores from September 2020 through January 2022.

65. A. Sharkey provided smaller payments to B. Mansour through B. Mansour's CashApp account $GreenCountryAuto (GCAuto & Parts), in addition to VenMo and PayPal. This same CashApp account was later discovered to have sent payments to various cutters for purchases of stolen catalytic converters. Sharkey sent payments to K. Mansour's PayPal account listed under the Gmail account kelseysofia69@gmail.com, totaling $4,650 across 4 documented transfers.

66. On September 24, 2020, B. Mansour provided the Mansour Residence in a Facebook message to A. Sharkey as the business address for Green Country Automotive and Parts, LLC., for the completion of a $4,250 wire transfer by Sharkey.

67. On October 1, 2020, investigators observed a Facebook message in which A. Sharkey asked B. Mansour for information for the pick-up of catalytic converters for shipment. B. Mansour sent the Mansour Residence address and stated that his garage is his shop.

68. On December 21, 2020, investigators observed a Facebook message in which A. Sharkey asked for B. Mansour's physical address to send him something. B. Mansour sent the Mansour Residence. Sharkey did not identify what he intended to send B. Mansour.

69. On December 27, 2020, investigators observed a Facebook message in which B. Mansour sent Sharkey a picture of a black plastic wrapped boxes of

33

catalytic converters inside of the Mansour Residence garage. B. Mansour stated that there were 152 catalytic converters in the outgoing shipment. On another occasion, B. Mansour sent Sharkey a photo of wrapped catalytic converter bins prepared for pick-up by ABF Freight in front of the Mansour Residence. The image clearly shows the background of B. Mansour's residential street.

70. On September 15, 2020, investigators observed a Facebook message in which B. Mansour sent the Mansour Residence address as a location for ABF Freight to pick-up a shipment.

71. On September 9, 2022, investigators interviewed a Cooperating Defendant (CD-2) familiar with B. Mansour. The SOI was identified as a cutter affiliated to B. Mansour over several years.

72. During the interview, CD-2 informed investigators that they were introduced to a fellow co-conspirator by B. Mansour, who requested that he "show him the ropes" on how to steal catalytic converters.

73. CD-2 stated that he has worked with B. Mansour on and off again for several years, both cutting and stealing catalytic converters and purchasing them for the business.

74. CD-2 stated that he knew B. Mansour to sell stolen catalytic converters to "Ty," or T. Curtis at the "Depot," referencing the Curtis Cores shop.

75. CD-2 also identified B. Mansour to have previously sold catalytic converters to Sharkey in New York. CD-2 stated that they have assisted B. Mansour

in packaging and shipping the deliveries, which were sent weekly and amounted to between 100 to 300 catalytic converters per shipment.

76. CD-2 admitted to several catalytic converter thefts locally, which the SOI stated that the stolen catalytic converters were sold to B. Mansour.

77. CD-2 consented to a search of their cellphone, and later a complete download of the contents. Investigators viewed messages on CD-2's phone with B. Mansour. One recent message to B. Mansour, was observed to include a photograph sent of a victim's vehicle, with an agreement to purchase the catalytic converter after the theft had been committed.

78. CD-2 stated that B. Mansour bragged that he earned just under $1,000,000 in illicit profits last year from stolen catalytic converters. CD-2 continued to state that B. Mansour claimed this income as related to his automotive mechanic business and that Weatherford helped him "cook the books."

79. CD-2 said that B. Mansour is an illegal drug user, and in the past has used heroin and illicit pills but is now using methamphetamine.

80. CD-2 identified B. Mansour to be partnered with another subject, Brennan Doss, who is providing B. Mansour methamphetamine. Investigators know from previous investigations that Doss is a cutter involved in catalytic converter thefts as well as a methamphetamine distribution.

81. CD-2 stated that B. Mansour also possesses numerous firearms, and always carries one on his person. CD-2 stated that they knew of an incident where B. Mansour pointed a handgun at a victim's head and made threats, over business

35

practices. CD-2 stated that B. Mansour always has both drugs and firearms on or around his person.

82. The Mansour Residence is listed as the home of B. Mansour on various records and databases, to include B. Mansour's Oklahoma driver's license, and registered vehicles, and in previous incident reports in TPD records. The phone subscriber information obtained by administrative subpoenas also list the location as a home address.

83. Communications show that B. Mansour uses the Mansour Residence for various criminal activities to include the storage, shipping, and site of purchase of catalytic converters. These include meeting with co-conspirators to purchase catalytic converters, packaging and storing within the residence, and sending outgoing shipments. Facebook communications show that B. Mansour has purchased and had deliveries of catalytic converters shipped to the Mansour Residence.

84. During interviews with various co-conspirators, B. Mansour was identified to possess both drugs and firearms at the Mansour Residence. This is supported by communications, such as on July 31, 2020, and November 28, 2020, when B. Mansour sent his address through Facebook messages to "Raven Green" (Facebook ID: 100000214030048) for the purchase of specifically "bars," or Xanax. On both occasions, B. Mansour sent Green the Mansour Residence address to deliver the drugs.

85. It is believed by observations of various communications and witness interviews that B. Mansour is an illegal user of narcotics, to include

36

methamphetamine, illicit Adderall, Xanax, Marijuana, and other drugs, and further

believed to not only purchase but distribute said illegal drugs. Those who use illegal

drugs often maintain these types of substances at their residence for personal use and

safe keeping.

86. Furthermore, B. Mansour is believed to possess several firearms, by his

own acknowledgement and communications with co-conspirators, photographs, and

witness interviews.

87. CD-2 and CD-3 stated they knew B. Mansour to own or possess between

12 to 15 firearms, which B. Mansour has used in acts of violence .

88. CD-3 described B. Mansour as a "gun guy," who collects firearms, and is

believed to have purchased at least one handgun from a cutter and convicted felon.

89. This is supported by communications on Facebook messenger in which B.

Mansour attempted to barter or sell numerous firearms to T. Curtis, and Curtis Cores

employees.

90. These firearms are possessed in a nexus to illegal drug use, and in the

commission of numerous felony crimes. Firearms are often used as a form of

protection, to secure both wealth and illegally obtained properties such as stolen

property or drugs, both believed to be possessed by B. Mansour. Firearms are

additionally maintained often as a source of wealth due to their value and most often

kept in large numbers within a personal residence for safe keeping. These firearms

are believed to be found not only at the Mansour Residence, but the Mansour Shop,

and on or about B. Mansour's person.

91. Further, investigators know that the criminal business related to the purchasing of stolen catalytic converters is mostly a cash-based enterprise. Cutters who steal catalytic converters to sell to intermediate buyers such as B. Mansour receive payments most often in the form of cash currency.

92. Additionally, the knowledge of the illegality of the business means that those involved often attempt to avoid a paper trail and tax reporting, which is easily done through cash transactions. With this knowledge, investigators have confirmed that B. Mansour has received payments totaling over $1,200,000 dollars over the past several years related to catalytic converters transactions. An analysis of financial records has shown that most of this wealth is not kept or maintained in bank accounts or financial institutions.

93. The large sum of cash that B. Mansour is required to keep on hand for the purchase of catalytic converters would most likely be stored within a personal residence, and most likely not be maintained within a business or other location due to the potential for theft. Further, all bank records, and previous business records have listed the Mansour Residence on various documents, invoices, and records. It is believed that B. Mansour uses the Mansour Residence to store various paperwork related to the illegal business of buying and selling stolen catalytic converters.

Mansour Shop

94. CD-2 stated that numerous cutters sell to B. Mansour, who is purchasing solely stolen catalytic converters. CD-2 stated that B. Mansour owns the mechanic shop and described it as the Mansour Shop, but stated that he does little actual

38

mechanic work, and instead subsists on purchasing and reselling stolen catalytic converters.

95. CD-2 stated that B. Mansour occasionally does have customers which come in for routine work at his shop. CD-2 stated that B. Mansour will cut and steal the unwitting customer's catalytic converters, replacing them with cheap aftermarket catalytic converters. B. Mansour will then sell the catalytic converters for a profit.

96. CD-4 is a cutter identified in numerous thefts in Tulsa, Oklahoma. CD-4 has been interviewed by investigators between 2021 and 2022. CD-4 identified himself to be partnered in catalytic converter thefts with subject Brennan Doss. Doss is now believed to be a co-conspirator and criminal partner of B. Mansour.

97. CD-4 stated that at the time, Doss and he split their profits from stolen catalytic converters. CD-4 said that Doss sold methamphetamine in addition to stealing catalytic converters. CD-4 admitted to being addicted to methamphetamine and told investigators that in lieu of the full cash payment, Doss would pay CD-4 partially in methamphetamine.

98. CD-4 was arrested and interviewed again by investigators on September 6, 2022. CD-4 stated that they had recently begun to sell catalytic converters to B. Mansour. CD-4 identified B. Mansour to be involved with several partners, to include Shadrick, Weatherford, and Doss. CD-4 stated that they often met B. Mansour at the Mansour Shop, but that sometimes B. Mansour would travel to them to purchase catalytic converters.

99. Between approximately March 2021 through September 2021, TPD and BAPD officers arrested cutter Timothy Carnline for CCTs on several occasions.

100. Through various Facebook communications, it was determined that Carnline and girlfriend and co-conspirator Natalie Southwood have sold stolen catalytic converters to Low and B. Mansour.

101. On September 17, 2021, Carnline was killed in Tulsa, Oklahoma, during an attempted theft of a catalytic converter and trailer. Several Facebook messages observed in communications show the knowledge of Carnline's death by B. Mansour and R. Mansour.

102. On September 23, 2022, 6 days after Carnline's death. A video was sent by R. Mansour to B. Mansour in Facebook Messenger. The video was of an unknown white male subject speaking to R. Mansour at the Mansour Shop. The subject was standing in front of the business door and the shopping center parking lot is visible within the video. The video started with R. Mansour asking, "Ben had called?" The unknown male stated "yeah," and continued that he had helped "him" out and was looking for someone with whom to maintain business. R. Mansour replied, "yeah, man that's crazy" and the unknown male stated that he thought it was a setup by one of their other friends with whom he used to work. The unknown male stated, "yeah, they shot him in the head and the neck." R. Mansour replied, "that's horrible man." The unknown male then asked, "tomorrow about this time?" and the video ended.

40

103. R. Mansour sent the video with the message "watch the video" at 12:04 pm to B. Mansour, who asked who was in the video. R. Mansour replied that his name was "JR." B. Mansour stated that he had never met him, but that he had saw him with "Scotty" once. R. Mansour replied, "rip." R. Mansour later stated that "JR" was coming tomorrow. At 5:11 pm, B. Mansour replied, "Poor Scotty though. Dude worked hard. Didn't deserve that." Timothy Scott Carnline was known to often go by his middle name, "Scotty." Investigators have located two Facebook profiles with the vanity name of "Scott Carnline," with publicly viewable profile pictures which investigators recognize as Carnline. Furthermore, Carnline is referred to as "Scotty" by interviewed family members, co-conspirators, and listed as an alias in law enforcement reports.

104. Other Facebook messages are observed between B. Mansour and Carnline's girlfriend Natalie Southwood (Facebook ID: 100023359779558) coordinating the exchange of stolen catalytic converters between May 2021 through June 2021. Southwood often mentions her boyfriend Scott in the conversations. During their first contact on Messenger, Southwood asked for an address and said Carnline will be on the way. B. Mansour sent the address for the Mansour Shop. B. Mansour then sent Southwood his "business line" of (918) 551-9456 to provide to Carnline.

105. On May 13, 2021, Southwood stated that Carnline had lost his cellphone, but that "they" have 7 catalytic converters to sell. On May 22, 2021, B. Mansour sent

Southwood a message that stated Carnline came by the shop last night at 2:00 am, and that he wanted to talk to him about that, and to complete "our transaction."

106. On May 25, 2021, Southwood mentioned that she has a friend that would like to sell a catalytic converter. B. Mansour asked that Carnline buy the catalytic converter, and he will buy it from Carnline, because he is not taking on new customers. On May 26, 2021, Southwood sent a message in which she apologized, and did not realize the risk involved of different people coming to the Mansour Shop, but Carnline explained it to her.

107. ABF Freight invoices obtained have shown that B. Mansour has shipped catalytic converters out-of-state. These records show that ABF Freight trucks have picked up several pallets on various dates from B. Mansour at the Mansour Shop.

108. An ABF Freight shipping invoice dated January 13, 2022, which listed B. Mansour having sent a delivery to Sharkey in New York. B. Mansour listed on the invoice the company name of Premier Hybrid and Battery LLC., with the address of the Mansour Shop. The shipment was sent to Sharkey's Capitol Cores business located at 151 Akron Street, Lindenhurst, New York, 11757. The shipment was listed to have contained 900 pounds of catalytic converters.

109. B. Mansour has communicated with several cutters through Facebook messages. One cutter Rodger Berry is known to have committed numerous catalytic converters thefts across Oklahoma and other nearby states.

110. Berry is documented in thefts in Tulsa, Oklahoma on January 16, 2022, February 2, 2022, and March 11, 2022. Berry is further listed in a Rogers County

42

Sherriff's Office catalytic converter theft report on December 2, 2021, and another Catoosa Police Department report on February 4, 2022, in which 5 catalytic converters were stolen, and on January 21, 2022, Stillwater Police Department arrested Berry, in possession of stolen catalytic converters in Stillwater, Oklahoma.

111. On February 14, 2022, investigators assisted Catoosa Police Department officers in serving two search warrants at locations associated with Berry and other cutters Dalton Davis, Dillion Kaiser, and Kent Thompson. Witnesses present identified Thompson and Berry to steal catalytic converters from across Oklahoma, Arkansas, Kansas and even Nebraska.

112. One anonymous witness showed investigators several CashApp transactions on December 8, 2021, and January 26, 2022, to the witness' account from transactions of stolen catalytic converters. The payments were sent by B. Mansour using his Green Country Auto & Parts CashApp account, sent to Kent Thompson and Rodger Berry, on the phone of the anonymous witness.

113.  B. Mansour and Berry communicated through 2,497 messages on Facebook between February 11th, 2021, to January 13th, 2022. Berry would often message B. Mansour late at night, the middle of the night, or early in the morning to meet to sell stolen catalytic converters.

114. Often, B. Mansour and Berry would meet at the Mansour Shop, and various other locations. B. Mansour offered tools, equipment, and loaned money to Berry in furtherance of committing catalytic converter thefts. Several messages

indicate B. Mansour's acknowledgement and awareness of the stolen source of Berry's delivered catalytic converters.

115. On July 31st, 2021, at 1:18 am, Berry messaged B. Mansour to ask if he was up and informed him that he was about to acquire three or four "torps," referring to torpedoes, which is the common slang term for large truck catalytic converters due to their appearance and shape. At 2:22 am, Berry told B. Mansour that he will have them in thirty to forty-five minutes. On one occasion, B. Mansour warned Berry to cease business for several days and be cautious due to the death by shooting of another B. Mansour related cutter, Timothy Carnline. B. Mansour informed Berry that it was "too hot."

116. Other Facebook messages recorded B. Mansour purchasing illicit prescription narcotics, such as Xanax or Adderall from Berry. On August 2, 2021, Berry told B. Mansour that he would ask someone about getting him some "bars," referring to Xanax. On August 11, 2021, B. Mansour told Berry that he lost his source for Adderall. B. Mansour stated that he had a $7,500 deal for illicit Adderall, but that the deal fell through.

117. On August 12, 2021, Berry stated that he could acquire 20 illicit Vyvanse pills at $10 each, to which B. Mansour stated "get em." On August 23, 2021, Berry sent B. Mansour that he was on the way to deliver Adderall. Berry would follow-up that he left 10 pills, and "2 halves," with Weatherford at the Mansour Shop.

118. On November 26, 2021, Berry informed B. Mansour that he had Xanax available. On July 24, 2021, Berry stated that he was bringing B. Mansour firearms

44

and .22 caliber, 9mm caliber, and .380 caliber ammunition. Berry said that he was uncomfortable driving with both, as he is a convicted felon, to which B. Mansour stated that he would get him a ride to bring to firearms and ammunition.

119. On June 28, 2022, CD-4, a cutter affiliated to B. Mansour, was detained in a traffic stop by TPD officers in possession of reciprocating saws and a stolen catalytic converter. CD-4 was interviewed by investigators while in custody. CD-4 admitted that they had brought stolen catalytic converters to B. Mansour for over one year. When asked how many they have brought B. Mansour, CD-4 simply stated, "a lot." CD-4 stated that he would meet B. Mansour at the Mansour Shop.

120. CD-4 continued to further identify that B. Mansour uses illegal drugs which CD-4 referred to as "pharmaceuticals." CD-4 consented to a search of their personal cellphone in their presence, which revealed numerous text messages and Facebook messages between B. Mansour and CD-4 discussing the exchange of stolen catalytic converters.

121. On November 17th, 2021, through Facebook messages, B. Mansour and Weatherford discussed cutter Jeremy Bennett being released from jail. The communication confirmed that both B. Mansour and Weatherford knowingly purchased catalytic converters from Bennett and anticipated more from him in the future with his release. Bennett is a career criminal with numerous arrests.

122. On November 9th, 2021, several days prior to the conversation between B. Mansour and Weatherford, Bixby Police Department arrested Bennett for catalytic converter thefts in Bixby, Oklahoma. Bennett has committed other thefts in

Tulsa, Oklahoma. B. Mansour communicated with Bennett via Facebook between October 5, 2020, through April 7, 2021, across 181 messages discussing the purchases of stolen catalytic converters obtained by Bennett.

123. In the discussion, Weatherford sent B. Mansour, "Jeremy just got out of jail so I should be seeing Cats from him before too long." Later, B. Mansour acknowledged that both Weatherford and he know that Bennett to have been arrested several times, nearby the Mansour Shop.

124. B. Mansour told Weatherford that they will continue to do business with Bennett, but more carefully, such as Weatherford meeting to buy catalytic converters away from the Mansour Shop. B. Mansour stated, "I'm pretty hesitant about other Jeremy because of reasons I will discuss with you in person. I actually don't need to say anything you already know what my concerns are so I will let you determine how you wish to move forward with him. But I definitely don't think it should be at shop." Weatherford replied, "He only meets me at my house anyways." B. Mansour continued to state, "That's exactly what I am referring to. I think henceforth that is the only way to go. Because all of his issues were in Bixby."

125. B. Mansour has communicated over Facebook with various cutters and co-conspirators the exchange of stolen catalytic converters at the Mansour Shop. It is believed that B. Mansour stores catalytic converters at the location, due to the presence of the automotive shop, which provides a legitimized appearance to possess the large number of catalytic converters.

126. During interviews with CD-2, CD-3, and CD-4, B. Mansour has been identified to use the Mansour Shop to store catalytic converters. CD-2 specifically stated that B. Mansour is known to hide catalytic converters in the ceiling, between the work floor and the office. CD-2 stated that these catalytic converters are concealed so as to not be observed by customers or the public. B. Mansour listed the Mansour Shop as a business location on various business documents, paperwork, and shipping invoices. It is believed that there are further records, both physical and electronic which will be located at the location, which constitute evidence in relation to the purchasing, packaging, and shipping of stolen catalytic converters.

127. CD-2 further stated that B. Mansour is known to have firearms at the location, as well as on his person. This is supported by information viewed in communications with other co-conspirators, in which B. Mansour has taken photos of firearms with the Mansour Shop visible in the background, sometimes alongside illegal drugs.

128. B. Mansour has been observed to purchase and exchange illegal drugs at the Mansour Shop. Transactions have included illicit Adderall, Xanax, and other pills, and it is believed that through recent interviews that B. Mansour is suspected to use methamphetamine. Through previous history and evidence as provided to date, it is believed that B. Mansour stores and possesses these illegal drugs and firearms, in a close physical proximity to each other within or about the Mansour Shop.

129. Previous interviews, such as with Lewis, have identified B. Mansour's business partner and co-conspirator Doss to sell methamphetamine and exchange methamphetamine for stolen catalytic converters.

### Mansour Storage

130. On April 2, 2021, B. Mansour sent Berry a Facebook message which consisted of the address for the **Mansour Storage** at the We Store Bixby Self Storage. B. Mansour asked that Berry meet him there to sell over $2,000 in catalytic converters. B. Mansour told Berry that it was "not populated," to avoid any witnesses to the transaction.

131. On February 27, 2021, Weatherford asked B. Mansour in a Facebook message what their storage unit numbers were and B. Mansour replied, "373..374."

132. On June 1st, 2022, an administrative subpoena was served at We Store Bixby Self Storage for the tenant roster and unit numbers. B. Mansour was listed on the tenant list and documented to currently rent unit #373. B. Mansour was involved in several other communications in which the **Mansour Storage** was mentioned.

133. Investigators know that it is common for those involved in the purchasing and transporting of stolen catalytic converters to maintain storage or cache sites such as the storage unit believed to be used by B. Mansour. The criminal business of purchasing stolen catalytic converters requires large spaces to maintain the bulky property. Further, those involved in the purchasing of stolen catalytic converters know that the appearance of catalytic converters in plain view of the public can bring unwanted scrutiny and the potential for unwanted law enforcement interaction.

Storage facilities such as the **Mansour Storage** are common locations for those involved in criminal activities to stash stolen catalytic converters that offer a secure place in which these items can be stored away from unwanted attention.

### Conclusion

134. Based on the information above, I submit that there is probable cause to search the **Subject Premises**, particularly a storage unit located at 13243 South Mingo Road, Bixby, Oklahoma, 74008, Unit #373, within Tulsa County, the State of Oklahoma, and the Northern District of Oklahoma, and including any vehicles on the curtilage premises that are registered to any of the **Target Subjects (Tyler Curtis, Reiss Curtis, Kimberly Biby, Thomas Biby, Ryan LaRue, Brian Thomas, Shane Minnick, Parker Weavel, Michael Rhoden, Benjamin Mansour, Rami Mansour, Brennan Doss, or Adam Sharkey)**, as further described in Attachment A, to seize items listed in Attachment B.

135. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

_____
Kansas S. Core
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to by telephone on this 28th day of October, 2022.

_____
SUSAN E. HUNTSMAN
UNITED STATES MAGISTRATE JUDGE

50

## ATTACHMENT A

### Property to be Searched

The property to be searched is a single storage unit located in a self-storage facility within the 13200 block of South Mingo Road. The unit to be searched is further described to be in a gated storage facility called "We Store Bixby Self Storage." The premises has two front entrances accessible from South Mingo Road, with the main entrance to the south and the first entrance to the east of the intersection of South Mingo Road and East 133rd Street South. This warrant shall include any vehicles located on the curtilage premises that are registered to any of the **Target Subjects (Tyler Curtis, Reiss Curtis, Kimberly Biby, Thomas Biby, Ryan LaRue, Brian Thomas, Shane Minnick, Parker Weavel, Michael Rhoden, Benjamin Mansour, Rami Mansour, Brennan Doss, or Adam Sharkey)**.

At the entrance is a business office to the south of the main gated entrance and consists of a white corrugated metal building, black trim, a front door of dark tinted glass, 2 dark tinted front windows, and a large metal and lime green colored overhead garage door. The storage containers within the premises are separated in rows within the "East Section" and the "West Section" and the unit to be searched is in the "East Section." The unit to be searched is in the fourth row from south to north of the "East Section." The unit to be searched is the twelfth unit from west to east and the entrance to the unit faces to the north. The unit to be searched is contained within a large metal building which consists of white corrugated metal,

black trim, and lime green overhead doors and marked with the unit number

designation "373" upon the metal door. The storage unit to be searched is more

commonly known as 13243 South Mingo Road, 74008, Unit #373, City of Bixby,

Tulsa County, and located within the Northern District of Oklahoma.



*a. Front Entrance to Storage Facility*



*b. Aerial View of Storage Facility, Unit to be Searched Indicated*



2

## ATTACHMENT B

### Particular Things to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of

violations of Title 18, United States Code, Section 1952 (Interstate and Foreign

Travel or Transportation in Aid of Racketeering Enterprises); Title 18, United States

Code, Section 1956(a)(1)(A)(i) (Laundering of Monetary Instruments); Title 18,

United States Code, Section 1957(a) (Engaging in Monetary Transactions in

Property Derived from Specified Unlawful Activity); Title 18, United States Code,

Section 2314 (Transportation of Stolen Goods); Title 18, United States Code,

Section 1343 (Wire Fraud); Title 21, United States Code, Section 841 (Possession of

a Controlled Substance with Intent to Distribute); and Title 18, United States Code,

Section 922(g) (Possession of a Firearm or Ammunition by a Prohibited Person),

involving subjects **Tyler Curtis, Reiss Curtis, Kimberly Biby, Thomas Biby, Ryan

LaRue, Brian Thomas, Shane Minnick, Parker Weavel, Michael Rhoden,

Benjamin Mansour, Rami Mansour, Brennan Doss, Adam Sharkey, et al**., and any

other co-conspirators, agents, contractors, or criminal associates, including:

   a. Any and all stolen goods such as automotive parts, including catalytic

      converters, and associated materials, to include catalyst material in a loose

      powder form, oxygen sensors, and other items that have been utilized in

      furtherance of the continued criminal activities described in this affidavit;

b. Any and all proceeds, monetary and negotiable instruments connected to the ongoing criminal activity and **Target Offenses**, to include but not limited to U.S. Currency, cashier's checks, foreign currencies, blank checks, or checks made out to "cash," and precious metals such as gold and silver bars;

c. Documents, records, or correspondence pertaining to the possession, sale, theft, and transportation of catalytic converters.

d. Documents, records, or correspondence, pertaining to shipping, receiving, purchasing, and selling of fraudulently acquired or stolen catalytic converters through interstate commerce via private or public means across state or international boundaries, such as records of the United States Postal Service, FedEx, UPS, contracted freight shippers, and private shippers.

e. Ledgers, both digital and physical, as well as other documents reflecting purchases and sales of stolen goods involving **Subjects**, or their co-conspirators, to include, records of transactions, sources, customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sales, of the **Target Offenses**, including but not limited to money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or

2

received, drugs supplied or received, cash received to be paid for stolen or illegal activities or intended to be paid for illegal activities, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

f.  Payments records, deposit records, delivery and shipping schedules, contracts, and other records showing the services and payments related to stolen catalytic converters made to persons providing services on behalf of or to the **Subjects**, or their co-conspirators.

g.  Bank and brokerage account monthly statements, opening records, checks, wire transfers, check registers, cancelled checks, deposit tickets, and records of transfer related to the sale, purchase or shipment of stolen catalytic converters, and the laundering of money and financial assets, or other **Target Offenses**, associated with the **Subjects**, or their co-conspirators.

h.  Invoices, purchase orders, credit card information, wire transfers, payments, account statements, and financial records related to the sale, purchase or shipment of catalytic converters, or other **Target Offenses** related to the **Subjects**, or their co-conspirators.

i.  All computers, tablets, hard drives and electronic storage devices, and computer equipment capable of containing evidence related to the **Target Offenses**, including the sale, possession, purchase, or transportation of

3

stolen catalytic converters, controlled, or possessed by the **Subjects**, or their

co-conspirators;

j.   Cellular telephones, and other electronic mobile devices, and the

electronically stored data on cellular telephones or other electronic storage

devices, such as PDA's or electronic organizers (a separate warrant will be

requested for these items);

k.   Electronic memory chips or storage chips or SIM cards used in cellular

telephones and the data and information stored thereon. Computers and

data storage devices including discs, drives, CD's and DVD's and the

electronically stored data thereon (a separate warrant will be requested for

these items);

l.   Documents showing ownership of real or personal property of the

**Subjects**;

m. Items of personal property tending to establish the existence of the

conspiracy related to the **Target Offenses** including but not limited to

personal telephone bills, photographs and documents and other items

reflecting names, addresses, telephone numbers, and communications;

n.   Materials, equipment, or machines used for distributing, packaging, and

weighing stolen property, and equipment and materials used in the

building or using of concealed compartments, commercial shipments, or

other methods of interstate transportation of stolen goods;

4

o. Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

p. Records of mail and communication services for cellular telephones and other communication devices which evidence the participation listed **Target Offenses**;

q. Records and items reflecting travel for the purpose of participation in listed **Target Offenses** including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

r. Any and all appointment calendars;

s. Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial transactions including the purchase of real estate and documents showing ownership of real estate;

t. Records relating to employment, wages earned and paid and other compensation records.  Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

5

u. Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating proceeds obtained through **Target Offenses**, particularly: financial records of withdrawals, funds of transfers, purchases, sales, transfers of assets or consolidation of assets. Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

v. Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

w. Any and all firearms, arms, or weapons, that have been used in the ongoing criminal activities, or otherwise possessed by prohibited persons, whether sold, purchased, or used in the commission of the purchase and sale of stolen property and wares, to include protection from robbery or any other illegal use, to include accessories, and ammunition;

6

x. Any and all controlled dangerous substances, or drugs, including marijuana, possessed, stored, concealed, or otherwise maintained in nexus to or within the proximity of located firearms, or with an identifiable association to the possession, use, concealment, or otherwise possession of firearms.